# District of Columbia
# Court of Appeals

**Nos. 11-CF-557 & 14-CO-832**

ERIC GARDNER,

Appellant,

v.

UNITED STATES,

Appellee.



FILED

JUN **23** 2016

DISTRICT OF COLUMBIA
COURT OF APPEALS

**FEL-7761-04**

On Appeal from the Superior Court of the District of Columbia
Criminal Division

BEFORE: WASHINGTON, *Chief Judge*; GLICKMAN, *Associate Judge*; and REID, *Senior Judge*.

## J U D G M E N T

This case came to be heard on the transcript of record and the briefs filed, and was argued by counsel. On consideration whereof, and as set forth in the opinion filed this date, it is now hereby

ORDERED and ADJUDGED that the appellant's convictions for first-degree felony murder while armed and the related convictions of possession of a firearm during crime of violence ("PFCV") and carrying a pistol without a license ("CPWL") are affirmed. The case is remanded, however, so that the trial court may vacate as merged appellant's conviction for attempted armed robbery and the related PFCV conviction.

For the Court:

*Julio A. Castillo*

JULIO A. CASTILLO
Clerk of the Court

Dated: June 23, 2016.

Opinion by Senior Judge Inez Smith Reid.

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 11-CF-557 & 14-CO-832

ERIC GARDNER, APPELLANT,

FILED   6/23/16
District of Columbia
Court of Appeals

*Julio Castillo*
Julio Castillo
Clerk of Court

V.

UNITED STATES, APPELLEE.

Appeals from the Superior Court
of the District of Columbia
(FEL-7761-04)

(Hon. Robert I. Richter, Trial Judge)

(Argued January 21, 2016                    Decided June 23, 2016)

*Benjamin Brooks* for appellant.

*Nicholas P. Coleman*, Assistant United States Attorney, with whom *Vincent H. Cohen, Jr.*, Acting United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *Suzanne Grealy Curt*, *Michelle D. Jackson*, and *Mary Ann Snow*, Assistant United States Attorneys, were on the brief for appellee.

Before WASHINGTON, *Chief Judge*, GLICKMAN, *Associate Judge*, and REID, *Senior Judge*.

REID, *Senior Judge*:  These appeals arise from the indictment of appellant,

Eric Gardner, on several felony charges related to the shooting death of cab driver

Andrew Kamara on November 12, 2004.[1]  A jury convicted Mr. Gardner of some

of the charges in November 2006, but this court reversed his convictions because

of errors in the admission of DNA evidence.  We remanded the case for a new

trial.  *See Gardner v. United States*, 999 A.2d 55, 63 (D.C. 2010).  The government

retried Mr. Gardner in late March and early April 2011.  At the conclusion of that

trial, a jury again convicted Mr. Gardner of some of the charges.[2]

In these consolidated appeals (direct and collateral),[3] Mr. Gardner argues

that his convictions must be reversed and the case remanded for a new trial

because the trial court:  (1) committed prejudicial error in permitting the firearms

---

[1]  The charges included attempted robbery while armed, in violation of D.C. Code §§ 22-1803, -2801, -4502 (2001); first-degree murder while armed (premeditated), in violation of §§ 22-2101 and -4502; first-degree felony murder while armed, in violation of §§ 22-2101 and -4502; second-degree murder while armed, in violation of §§ 22-2103 and -4502; carrying a pistol without a license (CPWL), in violation of § 22-4504 (a); and two counts of possession of a firearm during a crime of violence or dangerous offense (PFCV), in violation of § 22-4504 (b).

[2]  The jury found Mr. Gardner guilty of attempted robbery while armed and the related PFCV charge; first-degree felony murder while armed and the related PFCV charge; and CPWL.  The second-degree murder charge was dismissed as duplicative.

[3]  Mr. Gardner filed a direct appeal.  He later filed a post-conviction motion in the trial court alleging ineffective assistance of counsel pursuant to D.C. Code § 23-110 (2012 Repl.).  The trial court denied his motion, and Mr. Gardner noticed an appeal.

examiner to give an "unqualified and certain" expert opinion that the bullet recovered from the decedent's body came from a specified silver gun, and the court further plainly erred by failing to exclude the firearms examiner's testimony that he "had a second examiner confirm [his findings]"; (2) abused its discretion in admitting DNA "demonstrative evidence" (DNA testing data results depicted on two charts) to illustrate the DNA analyst's testimony; (3) precluded Mr. Gardner from testifying about a government witness' reputation as a "jailhouse snitch," and erred by refusing to give a requested instruction on "cooperating witnesses"; (4) committed prejudicial error in limiting cross-examination of Metropolitan Police Department ("MPD") Officer Scott Craiger; (5) erred in concluding that Mr. Gardner's post-arrest statement to the police was voluntary and thus admissible to impeach his trial testimony; and (6) erred when it denied his D.C. Code § 23-110 motion – the motion alleged that defense trial counsel was constitutionally ineffective for failing to (a) effectively cross-examine the firearms examiner concerning his unqualified opinion about the identity of the murder weapon; (b) proffer a basis for admitting Mr. Gardner's knowledge of one of the government's cooperating witnesses' reputation as a snitch to bolster Mr. Gardner's testimony; (c) object to false hearsay statements made by detectives during their interrogation of Mr. Gardner. Mr. Gardner also argues that, even if no individual claim of error

warrants reversal, the cumulative impact of the errors requires reversal of his convictions.

First, we hold that in this jurisdiction a firearms and toolmark expert may not give an unqualified opinion, or testify with absolute or 100% certainty, that based on ballistics pattern comparison matching a fatal shot was fired from one firearm, to the exclusion of all other firearms; we further hold that the error was harmless in this case. Second, we conclude that the trial court did not abuse its discretion in admitting the DNA expert's testimony and demonstrative charts. Third, we conclude that (a) even assuming that the trial court should have permitted Mr. Gardner to respond to proposed questions from his defense counsel about Mr. Gardner's knowledge of Mr. Cunningham's reputation as a snitch, Mr. Gardner suffered no prejudice; and (b) the trial court did not abuse its discretion by denying Mr. Gardner's request for the plea agreement instruction. Fourth, we conclude that even assuming the trial court erred by limiting the cross-examination of Officer Craiger, the error was harmless under the constitutional and non-constitutional harmless error standards.

Fifth, we hold that Mr. Gardner's statement to the police was not involuntary, and that during the police interrogation, Mr. Gardner's will was not

overborne in such a way as to render his confession the product of coercion. Sixth, we conclude that Mr. Gardner has failed to satisfy the prejudice prong of an ineffective assistance of counsel claim. Sixth, we conclude that there were no cumulative errors requiring reversal of Mr. Gardner's convictions. Consequently, we affirm his conviction for first-degree felony murder while armed and the related PFCV and CPWL convictions, but remand this case so that the trial court may vacate as merged Mr. Gardner's conviction for attempted armed robbery and the related PFCV conviction.

## FACTUAL SUMMARY

The government presented testimony showing that Tahisha Dean was with Mr. Gardner most of the day on November 11, 2004, and continuing until the early morning hours of November 12, 2004. Ms. Dean testified that she, Mr. Gardner, and his brother, Floyd Jackson, rented room 114 at the Motel 6 on Georgia Avenue and Aspen Street, in the Northwest quadrant of the District of Columbia.[4] The

---

[4] Mr. Jackson testified; he confirmed that he paid for the room with his credit card. The government introduced into evidence a receipt for the payment, signed by Mr. Jackson and dated November 11, 2004, at 21:25 (9:25 p.m.), as well as a copy of Mr. Jackson's driver's license and credit card. Mr. Jackson later explained that Ms. Dean and Mr. Gardner were given card keys to access the room.

prosecutor confronted Ms. Dean with her grand jury testimony where she stated, under oath, that Mr. Gardner showed her a "[s]ilver, chrome" gun with either a black handle or "a black strip on the front" that "[l]ooks like a .45 or something like that. Automatic . . . ."[5]

Mr. Gardner and Mr. Jackson later left the motel room together, and Mr. Gardner returned alone at "[a]bout 2:00 o'clock" in the morning on November 12. He was acting "[n]ervous and in shock."[6]

---

[5] On cross-examination, Ms. Dean admitted to a long history of drug abuse, particularly PCP, and memory problems related to drug abuse. She claimed that in Fall 2004, she also suffered from acute symptoms related to bipolar disorder, schizoid disorder, and post-traumatic stress disorder, and that the street drugs she was taking with her prescribed medication interacted poorly and negatively affected her memory. However, Ms. Dean stated that at the time she gave statements to the police and testified before the grand jury, closer in time to the criminal acts in this case, her head was clear.

[6] According to Mr. Jackson, around midnight he and Mr. Gardner went to a nearby carryout restaurant, at which point Mr. Jackson left to pick up a friend. When he returned to the restaurant shortly thereafter, he discovered that Mr. Gardner had already left. Mr. Jackson claimed that he was in the motel room when Mr. Gardner returned around 1:00 a.m. Mr. Gardner looked upset upon his return. Shortly thereafter, Mr. Jackson left. During cross-examination, Mr. Jackson claimed Mr. Gardner was upset because Mr. Jackson had left him at the carryout restaurant. Mr. Jackson denied seeing any blood on Mr. Gardner or any attempt by Mr. Gardner to wash anything off his hands or his clothes.

At the time of the shooting, Mary Ball lived across the street from the crime scene. In the early morning hours of November 12, 2004, Ms. Ball was asleep in her bedroom when she awoke to the sound of "a loud crash which sounded like a car hitting another car." She went to her bedroom window, which gave her a view of 9th Street. She noticed that "a cab had run into the back of a parked car." She "saw a young man running from the cab -- from the direction of the cab."[7] She described him as "wearing a dark jacket with a fitted waist[,] maybe a[n] elasticized waist[,] [and] dark pants . . . ."[8] He "kept turning back and looking towards the cab [and] he was also running through the front lawns of the houses along 9th Street." Just before he ran out her line of sight, Ms. Ball watched him run "towards [her] house" and "down the alley towards Georgia Avenue . . . ."

When police responded to the scene, they found Mr. Kamara's lifeless body covered in blood.[9] Police recovered a single expended cartridge casing from the

---

[7] She described the man as young because "he moved with an ease and grace of a young person" and she observed further, "He was tall, slim."

[8] According to one of the first officers to respond to the scene of the shooting, MPD Officer Kimberly Kniffen, Ms. Ball told her that the young man was wearing a "black coat" and "blue jeans."

[9] An autopsy determined that Mr. Kamara died of a single gunshot wound to his head. The bullet entered Mr. Kamara's face near his right eye, went through

(continued…)

inside of the cab. They were not able, however, to preserve a bloodstain that an officer observed on the right rear passenger window of the cab when she first arrived at the scene.

In the early morning hours of November 12, 2004, Daniel Arkorful, the front desk attendant at the Motel 6 on the night of the shooting, saw a young man "c[o]me in walking fast . . . as if somebody was after him or something." He asked the man to show ID, but the man simply "said Room 114" and "didn't stop, he didn't turn . . . ." Although he did not see the young man's face clearly, Mr. Arkorful described him as a "black person" wearing "sneakers, he was in jeans, and he had a jacket on him . . . ."

After the report of the traffic accident led to the discovery of Mr. Kamara's body, police canvassed the area. Former MPD Officer Scott Craiger began the canvass at the Motel 6 due to its proximity to the shooting, his familiarity with the area, and his knowledge that the motel was often used by criminals as a hiding place. He went into the motel lobby with other officers, one of whom asked Mr. Arkorful "if someone had come in, you know, like excited[,] in a hurry or anything

(…continued)
his brain, and came to rest in the back left part of his skull, where the examiner recovered it.

like that," to which Mr. Arkorful responded "that an individual wearing a black coat had come in, asked to be buzzed into Room 114." The officers went to the door of room 114, but waited to knock and announce their presence, to confirm their suspicion that the suspect was in the room and to allow backup to arrive.

Officer Craiger testified that he heard several things when he was waiting at the door to Mr. Gardner's motel room prior to entering. He heard a male voice inside the room (which turned out to be Mr. Gardner) saying he "need[ed] to get this stuff off of me, I'm very amped up right now." He heard "a shower running in the background" and just before entering the room, he "heard the distinct sound of a weapon -- the slide of a weapon being racked like as if someone pulled it back and let it go like that."[10] When he entered the room, Officer Craiger saw a window that was open but he did not see any male person. Defense counsel extensively

---

[10] During cross-examination, Craiger clarified that the sound "is when the sliding of the -- the slide pulling back on a weapon, when you release the slide, it makes a sound. It doesn't, in fact, chamber a round into a weapon, yes, but that sound, you can't hear the round being chambered. It's a sliding of the weapon. The metal against the metal." He admitted, however, that the sound "[p]ossibly" indicated that someone inside the room was getting ready to fire a gun.

impeached Officer Craiger's testimony about what he heard at the motel room door.[11]

Officer Eldred Boria, who had responded to the call for backup, was sitting in her police car when she saw Mr. Gardner climb out of a window on the side of the motel. She exited her car and approached him, and when he saw her approaching,[12] he dropped his jacket and a black gun[13] and began running. She and her fellow officers were able to apprehend Mr. Gardner soon thereafter. At the time, Mr. Gardner was wearing "black jeans," "a black T-shirt," and a "silk black cap." Another officer observed that on the sidewalk near the motel there was a black coat that "had what appeared to . . . be blood on it." An MPD evidence technician, Officer Richard Steven Griffin, collected the jacket as evidence and took swabs from it because he observed "some reddish stains that . . . were

---

[11] For example, Officer Craiger admitted that he did not see any blood inside the bathroom after he entered the room. He next admitted that despite the importance of his status as a witness in a homicide case, he failed to take notes or fill out a witness statement regarding anything he observed while standing outside of the room. He then acknowledged that he did not testify at the grand jury in this case and that his first time testifying about his observations was at Mr. Gardner's first trial.

[12] Officer Boria was "[i]n full uniform" at the time.

[13] The black gun was later found to contain a magazine with fourteen cartridges in it, but it had no cartridge loaded in the chamber.

consistent with bloodstains that were on the exterior of the jacket," and he was concerned that rain would wash away the stains.[14]

Later on November 12, police canvassed the area for additional evidence. Brenda Maria Butuche, who at the time was in training at the police academy, participated in the canvassing. While searching in the same alley in which Ms. Ball saw a young man running that morning, Ms. Butuche found a "[s]ilver and black" gun "towards the end of the alley inside of, like, a hole in the rear of a -- I guess a house at the end of the alley. And like the rear end had a little cubby hole." The gun was found with "[o]ne round . . . in the chamber[] and . . . three rounds in the magazine."

Gerald Cunningham met Mr. Gardner while the two were inmates together in the D.C. Jail in February 2005.[15] According to Mr. Cunningham's testimony,

---

[14] DNA analysis of one of the stains from the jacket indicated that the stain contained DNA from more than one donor, and further, that the victim "c[ould ]not be excluded as the possible predominant donor to th[e] mixture." Ms. Amber Moss conducted and testified about other DNA tests which will be described later in this opinion.

[15] Mr. Cunningham had significant experience with the prison system over the years, admitting to over a dozen convictions for which he had spent time in jail or prison.

Mr. Gardner approached him to ask for advice about Mr. Gardner's case. Eventually Mr. Gardner admitted to trying to rob Mr. Kamara and shooting him "in the back of the head" when he refused to give up the money. Defense counsel strongly impeached Mr. Cunningham's testimony on cross-examination.[16]

Mr. Gardner testified for the defense, as follows. He was in the cab at the time of the shooting, and there was a third person who tried to rob him and Mr. Kamara. After the cab had stopped on Aspen Street next to the Motel 6, he had pulled out cash for his cab fare. "A gun was placed through the window" "in [his] face" but "it was mostly pointed at [Mr. Kamara]." Mr. Gardner struggled with this alleged third person, after which Mr. Kamara hit the gas to accelerate the cab. The cab started moving, and a shot rang out. Mr. Gardner turned to see if the shooter was still there, only to witness him running away from the Motel 6. The

---

[16] Defense counsel elicited details of Mr. Cunningham's veritable decades-long criminal career and his incarceration for the majority of his adult life. Mr. Cunningham admitted he had "heard about [Mr. Gardner's case] on TV" before he met Mr. Gardner. He also admitted that he was aware that he could receive time off his prison sentences if he cooperated in cases unrelated to his own; he acknowledged having done exactly this on multiple prior occasions, earning himself a reputation as a jailhouse snitch among his fellow inmates. When pressed by defense counsel, Mr. Cunningham denied having any agreement or understanding with the government concerning his cooperation in Mr. Gardner's case, but admitted that he was cooperating in hopes of receiving leniency from the government in his pending case. Defense counsel heavily emphasized this impeachment evidence in closing argument.

cab turned from Aspen Street onto 9th Street and eventually crashed into a parked car, after which Mr. Gardner got out of the car and "ran to the Motel 6." Mr. Gardner stated that "there was probably a possibility [that] some [blood] was on [his person]," but he did not see any on his clothes. He also admitted during cross-examination that he ran down the same alley that Ms. Ball had seen the young man run down that early morning. [17]

## ANALYSIS

### The Ballistics Expert's Unqualified Opinion

#### *Factual Context*

Prior to the government calling Lyndon Watkins, its ballistics expert, defense counsel asked that the trial court rule that "what is appropriate is for the expert to testify specifically in this case that the bullet that was recovered from the decedent is consistent with . . . one of the pistols that he was given to examine but

---

[17] During cross-examination, the government impeached some of the details of Mr. Gardner's testimony with a statement he had made to detectives shortly after his arrest.

not state that it was . . . [with] any scientific certainty." In response to the trial court's question as to what the expert planned to say, the prosecutor responded, "That Government Exhibit 71 fired the bullet that was found in Mr. Kamara's [body] and also expended the cartridge that was found on the 9th Street scene outside. That was his previous testimony." The trial court replied that he would let the expert "state his conclusions -- his reasonable conclusions and you can impeach him up and down, if you want."

Mr. Watkins testified that he examined both the black gun that Mr. Gardner dropped when he exited the Motel 6 window (Government Exhibit 7) and the silver gun found near the crime scene (Government Exhibit 71), as well as a .9mm Luger cartridge case found at the crime scene (Government Exhibit 2) and the copper jacketed bullet removed from Mr. Kamara's head (Government Exhibit 18), to determine whether either gun was linked to the shooting. He concluded that "Government's Exhibit 2 and Government's Exhibit 18 were not fired in Government's Exhibit 7"; hence, the black gun was not the murder weapon. Mr. Watkins also compared ammunition test-fired from the silver gun (Government Exhibit 71) with the bullet removed from the decedent (Government Exhibit 18) and with the cartridge casing recovered from the crime scene (Government Exhibit 2). He opined "that Government Exhibit 2 was fired in Government Exhibit 71 --

firearm, and Government Exhibit 18, which is the copper jacketed bullet was fired from the barrel of Government's Exhibit 71." In essence, Mr. Watkins found that the markings made on the test ammunition were consistent with the markings on the recovered bullet and casing,[18] and he stated that the silver gun was the murder weapon.

Mr. Watkins confirmed his unqualified opinion on cross-examination and redirect examination. From his analysis, Mr. Watkins testified unequivocally that in his opinion, the silver gun fired the killing shot, reiterating that conclusion on cross examination when defense counsel stated, "I believe your . . . expert opinion was the bullet recovered from Mr. Kamara, which is Item Number 18, was consistent with having been fired from the silver pistol; is that correct?" Mr.

---

[18] On cross-examination, Mr. Watkins acknowledged that "the 14 bullets associated with the black gun . . . were marked by the same tool as one of the bullets that was [removed from Mr. Kamara] and associated with the silver gun," and that "this marking occurred . . . during the reloading process." Thus, during both direct examination and cross-examination, Mr. Watkins asserted that both the black gun and the silver gun had "reloaded" ammunition with similar markings, indicating that the ammunition was reloaded by the same reloading machine. However, he explained that "a lot" of companies commercially produce reloaded ammunition and a single bullet reloading machine can produce "tens of thousands of reloaded bullets" in eight hours, meaning that "there could potentially be millions of reloaded bullets with th[e] same marking" as that found on the ammunition associated with the two guns in this case. He pointed out that consumers can find reloaded ammunition at "most gun stores," at gun shows, and even on the internet.

Watkins responded, "It was fired from the pistol, yes sir." On redirect examination, the prosecutor specifically asked Mr. Watkins, "Just to be clear, sir, your -- your scientific -- your opinion here is Government Exhibit Number 18, the bullet, [was] fired from Government 71[,] or was it consistent with being fired from Government Exhibit 71?" Mr. Watkins replied, "It was identified as having been fired from Government Exhibit 71." Defense counsel again objected "to that sort of unqualified statement of opinion."

### *The Parties' Arguments*

On appeal, Mr. Gardner argues that he (1) objected to Mr. Watkins expressing an opinion "with scientific certainty" ("essentially an unqualified opinion") that the silver gun found near the scene of the crime fired the fatal bullet, and (2) asked the trial court to "limit such opinion testimony to the statement that the recovered bullet and casing were 'consistent with' subsequent test firings from the silver gun.'" He maintains that "the trial court's refusal to exclude [Mr.] Watkins' unqualified opinion in this case was error."

The government does not deny that the trial court erred in allowing Mr. Watkins to give an unqualified opinion that the silver gun fired the bullet that

killed Mr. Kamara. Rather, the government contends that "any possible error in the admission of [Mr.] Watkins' testimony without 'qualification' was harmless." In reply, Mr. Gardner argues that the error in admitting Mr. Watkins' unqualified opinion was not harmless because "it cannot be said with a 'fair assurance' that the unchallenged and essentially uncontroverted nature of [Mr. Watkins'] testimony that the silver gun was the murder weapon did not have a substantial effect on the jury," and "the difference between whether the silver gun was definitely the murder weapon or whether it was simply believed by the ballistician to be the murder weapon may well have affected the jury's deliberations."

### *Standard of Review and Applicable Legal Principles*

"The trial judge has wide latitude in the admission or exclusion of expert testimony." (*John*) *Jones v. United States*, 990 A.2d 970, 977 (D.C. 2010). "Ordinarily, where the claim of error was preserved by timely and proper assertion in the trial court, we review the judge's ruling for abuse of discretion." *Id*. "In assessing whether non-constitutional error was harmless, we apply the standard set forth in *Kotteakos v. United States*, [328 U.S. 750, 765 (1946)]." *Hernandez v. United States*, 129 A.3d 914, 923 (D.C. 2016). Under *Kotteakos*, this court must determine "whether we can say, 'with fair assurance, after pondering all that

happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.'" *Clayborne v. United States*, 751 A.2d 956, 968 n.12 (D.C. 2000).

### *Discussion*

For decades this jurisdiction has allowed the admission of expert testimony concerning ballistics comparison matching techniques. *See Laney v. United States*, 294 F. 412, 416 (D.C. Cir. 1923) (the court admitted expert testimony "tending to establish that the bullet, extracted from the head of the deceased, was shot from the pistol found in the defendant's possession"); *see also* (*Ricardo) Jones v. United States*, 27 A.3d 1130, 1137 (D.C. 2011) ("Pattern matching is not new, and courts in this jurisdiction have long been admitting firearms identifications based on this method."). Beginning around 2008, however, questions about pattern matching generally, and bullet pattern matching specifically, surfaced in the scientific community. *See* Jules Epstein, *Preferring the "Wise Man" to Science: The Failure of Courts and Non-Litigation Mechanisms to Demand Validity in Forensic Matching Testimony*, 20 WIDENER L. REV. 81 (2014); Note, *Firearms Identification: The Need for a Critical Approach To, and Possible Guidelines For,*

*the Admissibility of "Ballistics"Evidence*, 17 SUFFOLK J. TRIAL & APP. ADV. 54 (2012).

The National Research Council, an arm of the National Academy of Sciences, commissioned a committee to study the matter, and in 2008 the committee issued a report on ballistics imaging, *see* Daniel L. Cork, et al., BALLISTICS IMAGING 3 (2008), stating in part: "The validity of the fundamental assumptions of uniqueness and reproducibility of firearms-related toolmarks has not yet been fully demonstrated." Epstein, *supra*, 20 WIDENER L. REV. at 86. The Congress of the United States also commissioned a study of the forensic sciences, and the National Research Council of the National Academy of Sciences designated another committee which produced a report in 2009, COMMITTEE ON IDENTIFYING THE NEEDS OF THE FORENSIC SCIENCE COMMUNITY, STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES: A PATH FORWARD (2009) (NRC REPORT). *See Pettus v. United States*, 37 A.3d 213, 225-28 (D.C. 2012) (discussing the NRC Report); Epstein, 20 WIDENER L. REV. at 81-83, 85-88. After the NRC Report issued, some jurisdictions began to limit the scope of a ballistics expert's testimony. *See* (*Ricardo*) *Jones*, *supra*, 27 A.3d at 1137, n.8 (identifying cases); Note, *supra*, 17 SUFFOLK J. TRIAL & APP. ADV. at 65-67 (discussing cases);

*Commonwealth v. Heang*, 942 N.E.2d 927, 937-45 (Mass. 2011) (offering guidelines for forensic ballistics testimony).

In 2011, this court faced the issue of ballistics experts' unqualified opinions in (*Ricardo*) *Jones*, *supra*. There, appellant argued "that the trial court should have . . . precluded the experts from stating their conclusions with 'absolute certainty excluding all other possible firearms.'" 27 A.3d at 1138. Unlike the situation in the case before us, the alleged error in (*Ricardo*) *Jones* was not preserved. However, Judge Fisher, writing for the court, explicitly noted the government's "represent[ation] that the current policy of the United States' Attorney's Office is to have firearms examiners qualify their conclusions to a reasonable degree of scientific certainty." *Id*. at 1138-39. Consequently, rather than deciding whether the trial court committed plain error by allowing an unqualified ballistics expert opinion, this court resolved the issue under the harmless error doctrine. We said: "In light of the government's representation and the growing consensus that firearms examiners should testify only to a reasonable degree of certainty . . . , we will assume, without deciding, that such experts should not be permitted to testify that they are 100% certain of a match, to the exclusion of all other firearms." *Id*. at 1138.

In 2016, the issue as to whether the trial court erred by allowing the ballistics expert to give an unqualified opinion was raised in another unpreserved error case, *Williams v. United States*, 130 A.3d 343 (D.C. 2016). We again did not decide the issue on the merits. However, "we question[ed] whether this court would want to endorse a policy of 'only elicit[ing] firearms examiners' opinions to a reasonable degree of scientific certainty,' in light of criticism that firearms examination does not involve any 'scientific' measure of certainty," citing both the Ballistics Imaging report, and the NRC Report. 130 A.3d at 348 n.11. The author of the opinion for the court in *Williams*, Judge Easterly, also concurred on the ground that the law in this jurisdiction "should" "clearly preclude a firearms and toolmark examiner from testifying with unqualified, absolute certainty." *Id*. at 351.

After discussing in some detail the reports issued by the National Research Council of the National Academy of Sciences, Judge Easterly remarked that "[t]he government state[d] in its brief [in *Williams*] that it is 'regrettable' that its expert was permitted to state his pattern matching conclusion with absolute certainty." *Id*. at 354. This is the second time we have noted in a published opinion the government's position that its ballistics experts should not give an unqualified opinion (that is, one with "absolute certainty"), based on pattern matching, that a fatal shot was fired from a particular gun.

In this preserved error case, we now hold that the trial court erred by allowing Mr. Watkins to give an unqualified opinion about the source of the bullet that killed Mr. Kamara. We further hold that in this jurisdiction a firearms and toolmark expert may not give an unqualified opinion, or testify with absolute or 100% certainty, that based on ballistics pattern comparison matching a fatal shot was fired from one firearm, to the exclusion of all other firearms.[19]

Our holding leaves us with one remaining question relating to the testimony of the ballistics expert in this case, whether the trial court's error in admitting the expert's unqualified opinion was nevertheless harmless. We conclude that the error is harmless. The government presented strong and compelling evidence which, with reasonable inferences drawn by reasonable jurors, established that Mr.

---

[19] The parties do not make any explicit arguments based upon either *Frye v. United States*, 293 F. 1013 (D.C. 1923) or *Dyas v. United States*, 376 A.2d 827 (D.C. 1977), and our holding does not encompass questions as to whether the art, science, or methodology of ballistics pattern comparison matching is generally accepted in the scientific community, or permits a reasonable opinion to be asserted by an expert. Thus, our holding is limited in that it allows toolmark experts to offer an opinion that a bullet or shell casing was fired by a particular firearm, but it does not permit them to do so with absolute or 100% certainty. (Mr. Gardner does make broad arguments about the failure of his trial counsel to render effective assistance of counsel by cross-examining Mr. Watkins about the reliability of his unqualified opinion; we address this issue later in the opinion). Moreover, we have doubts as to whether trial judges in this jurisdiction should permit toolmark experts to state their opinions "with a reasonable degree of certainty." *See Williams*, *supra*, 130 A.3d at 353, n.8 (J. Easterly, concurring).

Gardner shot and killed Mr. Kamara. Around 1:30 a.m. on the night when Mr. Kamara was killed, Mary Ball who lived close to the Motel 6 heard a crash. She looked out of her bedroom window that faced 9th Street. She saw a young man running from the direction of the cab while repeatedly turning around and looking over his shoulder, back towards the cab that had crashed. He ran down the alley that was close to the Motel 6. Ms. Betuche, a trainee at the police academy, noticed the silver gun towards the end of the alley, and Officer Cooper retrieved a silver gun with a black handle from the back of a residence at 921 Aspen Street. Ms. Dean testified that Mr. Gardner was in Room 114 of the Motel 6, located at Georgia Avenue and Aspen Street, before and after Mr. Kamara's murder. She connected Mr. Gardner to a gun that she described before the grand jury as "chrome, silver chrome," automatic, and also black.

Sometime before 2:00 a.m. and after Mr. Kamara's murder, Mr. Arkoful, the front desk attendant at the motel, saw a young man walking fast into the motel. He did not stop to show his identification but simply said, Room 114. Ms. Dean depicted Mr. Gardner as very agitated when he returned to Room 114. Officer Boria, who was stationed outside the motel, watched as Mr. Gardner climbed out of a window. When Mr. Gardner saw Officer Boria, he dropped his jacket and a black gun and started running. Officer Griffin picked up the jacket and saw a

reddish stain consistent with blood, and he took swabs of the stain. The government's DNA expert tested the swab containing a mixture of DNA. The expert indicated that Mr. Kamara could not be excluded as the predominant donor to the mixture.

Furthermore, Mr. Gardner's own testimony for the defense placed himself in the cab with Mr. Kamara, as well as at the motel before and after Mr. Kamara's murder. Mr. Gardner admitted jumping out of the motel window and running before being tackled by the police, as well as wearing the jacket (which appeared to have a blood stain) while he was in the cab. Mr. Gardner's account of a third party who allegedly killed Mr. Kamara was neither strong nor convincing. He stated that the gun which the alleged third party used "wasn't really pointed at" him (Mr. Gardner); it was "in [Mr. Gardner's] face" but "it was mostly pointed at [Mr. Kamara]." On cross-examination, Mr. Gardner asserted that the alleged third party did not run in the direction of the motel, and hence, by Mr. Gardner's own testimony this alleged person ran in a direction that did not take him past the point where the silver gun was found. However, Mr. Gardner stated that he, Mr. Gardner, ran through the alley, "straight out to Georgia Avenue straight to Motel 6," a path that took him in the direction where the silver gun was found. In the face of this strong and compelling direct and circumstantial evidence linking Mr.

Gardner and the silver gun to Mr. Kamara's murder, and even given the rigorous cross-examination of Mr. Watkins on the subject of reloaded bullets, we are able to say "'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.'" (*Ricardo*) *Jones*, *supra*, 27 A.3d at 1140 (quoting, *inter alia*, *Kotteakos*, *supra*, 328 U.S. at 765).[20]

## Admission of DNA Demonstrative Evidence (Two Charts)

### *Factual Context*

As indicated above, the government's DNA expert was Amber Moss. At the time of Mr. Kamara's murder, she was a senior forensic analyst at the Orchid Cellmark DNA private testing laboratory in Farmer's Branch, Texas. Prior to Ms. Moss' testimony, defense counsel objected to any attempt by the prosecutor to make a positive comparison between the incomplete DNA profile drawn from the

---

[20] Given this resolution, we need not further examine the government's evidence as a whole to determine whether the error relating to Mr. Watkins' opinion was harmless, as Mr. Gardner suggests we must. The error relating to Mr. Watkins' opinion went only to the strength of the evidence connecting the silver gun to the murder. Since we conclude that even in this limited context, the error was harmless, it follows that the error was harmless in the context of the case as a whole.

silver gun and Mr. Gardner's own DNA profile, that is, the objection was to any attempt "to connect the one locus [out of thirteen loci] that was developed as a [handgrips] profile on [the silver] gun with … Mr. Gardner's locus." When the prosecutor proffered that it would not elicit such a comparison, defense counsel noted that he "wouldn't object as long as she doesn't elicit the specific alleles and in any way draw that connection . . . ."

Ms. Moss testified about her "extraction of the evidence samples in this case," including swabs from the handgrips relating to the silver gun. Before she gave her opinion about the handgrips profile, the government introduced demonstrative evidence charts, Exhibits 131 and 132, which together reflected results (or no results) on 13 loci for items tested (including swabs of facial area and silver gun handgrips). Defense counsel voiced objection to the charts.[21] The prosecutor responded that the testimony she would elicit from Ms. Moss would establish that "no conclusions can be drawn" about the silver gun "because it's an incomplete [DNA] profile." The trial court overruled the objection, stated that defense counsel could make his points during cross-examination, and allowed the prosecutor to use the charts as demonstrative evidence.

---

[21] Defense counsel argued that the charts had no relevance and also were "incredibl[y] prejudicial" to Mr. Gardner.

Ms. Moss testified that the DNA profile from the silver gun, which was only a partial profile, yielded results at two loci out of the typical thirteen.[22] One locus revealed that the contributor of the DNA was male, and the other locus returning a result had peaks that were identical to Mr. Gardner's peaks at that same locus in his DNA. Ms. Moss opined that it is "not uncommon" for that locus to have those numbers; there was "no result" for "the rest of the chart" (eight loci); and hence, her "conclusion was an insufficient amount of DNA was obtained from the [silver gun handgrips] sample . . . to obtain a complete DNA profile." During cross-examination, Ms. Moss confirmed that it is "common" for a person's DNA profile to match another DNA profile at a single location.[23]

---

[22] In general, DNA profile comparison involves analyzing each profile at thirteen separate locations, or "loci." Each locus has two alleles that are represented by peaks on an electropherogram, which is a chart generated by software that analyzes the results from a machine that in turn analyzes the DNA sample. The peaks of the samples are then compared to determine if there is a match or not.

[23] We do not believe that the trial court's admission of the demonstrative DNA charts and the DNA expert's testimony was inconsistent with the government's proffer that the evidence would show that no conclusions could be drawn. After discussing the partial profile of the swab from the silver hand gun grip, in response to the prosecutor's statement that the expert could not reach any conclusion, the expert responded, "Correct. Our conclusion was an insufficient amount of DNA was obtained from the sample to - - to obtain a complete DNA profile." In addition, cross-examination by defense counsel underscored the fact that the DNA testimony regarding the silver handgun grip was of limited probative value, and that no stains were visible from a second, small cutting from the jacket.

### *Mr. Gardner's Arguments, Standard of Review and Legal Principles*

Mr. Gardner argues the trial court abused its discretion in admitting evidence related to an incomplete DNA profile from a swab taken from the murder weapon—specifically, Ms. Moss's testimony regarding her analysis of the profile and charts presented to the jury to help it understand her testimony. He contends that this evidence was irrelevant and substantially more prejudicial than probative.

"Our general rule is to grant broad deference to the trial court's determination of relevance, but we do not regard relevance as a particularly high bar for the proponent of the evidence to clear." *Richardson v. United States*, 98 A.3d 178, 186 (D.C. 2014) (citation omitted). Moreover, "[t]he probativity threshold for purposes of admissibility is low: An item of evidence, to be relevant, need only tend[] to make the existence or nonexistence of a fact more or less probable than would be the case without that evidence." *In re L.C.*, 92 A.3d 290, 297 (D.C. 2014) (internal quotation marks and citations omitted). But, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice it poses." *Johnson v. United States*, 683 A.2d 1087, 1101 (D.C. 1996) (en banc). Trial judges have discretion in balancing probative

value and prejudice, and we will only reverse the trial court's ruling for abuse of discretion. *Busey v. United States*, 747 A.2d 1153, 1165 (D.C. 2000).

### *Discussion*

Contrary to Mr. Gardner's contention, the fact that an incomplete DNA profile taken from the murder weapon matched his profile at two of the thirteen loci typically analyzed for comparison (one of which only indicated the gender of the donor—male, which would implicate almost half the world's population) was not irrelevant, given the low admissibility threshold regarding relevance. *See In re L.C.*, 92 A.3d at 297. Thus, neither Ms. Moss's testimony nor the charts illustrating her testimony were irrelevant, even though the DNA evidence of Mr. Gardner's connection to the silver gun was tenuous.

Similarly, the prejudicial effect of the analyst's testimony and demonstrative charts did not substantially outweigh their probative value. Ms. Moss clearly testified that the handgrips profile was only a partial one, and that there were no results for the majority of the thirteen loci. She also clearly articulated her conclusion that there "was an insufficient amount of DNA . . . to obtain a complete profile," and that it was "common" to find a match at a single locus. The

government did not attempt to overemphasize the probative value of the charts, which were presented to help the jury understand the expert's testimony. The trial court observed that Ms. Moss' testimony was "hard to understand" because she was "not an exact lay model of clarity." Mr. Gardner does not explain why exactly the jury, listening to this testimony and looking at the demonstrative charts, would erroneously focus in on the two matches, rather than the eleven loci that show no results whatsoever and the testimony that matching at two loci is "common." In short, we conclude that the trial court did not abuse its discretion in admitting Ms. Moss's testimony and the demonstrative charts.

**Mr. Cunningham, and the Plea Agreement Instruction**

Mr. Gardner complains that the trial court abused its discretion and committed reversible error not only when it refused to allow him (Mr. Gardner) to testify about his knowledge of Mr. Cunningham's reputation as a snitch, but also when it denied his request for the plea agreement instruction.[24] He contends that

---

[24] During Mr. Gardner's testimony for the defense, he stated that he would not tell Mr. Cunningham anything about his case, and that "there was a lot of things . . . being said about [Mr. Cunningham] around the jail." When defense counsel asked, "What were those things[,]" the prosecutor objected; the trial court sustained the objection and instructed Mr. Gardner not to respond.

"if he had been able to tell the jury that he knew of [Mr.] Cunningham's reputation as a jail house snitch, the jury might well have rejected [Mr.] Cunningham's testimony entirely, and the outcome of the case might have been different." He claims that the plea agreement instruction (indicating that "[t]he testimony of a witness who has entered into a plea agreement should be considered with caution") "was important to balance the prejudice caused by the tacit implication that the government and its agents believed [Mr.] Cunningham's account, and had therefore been willing to show him considerable leniency, despite his long and troubled criminal history."

"A decision on the admissibility of evidence . . . is committed to the sound discretion of the trial court, and we will not disturb its ruling absent an abuse of discretion." *Smith v. United States*, 665 A.2d 962, 967 (D.C. 1995) (citations omitted); *see also Matthews v. United States*, 892 A.2d 1100, 1105 (D.C. 2006) (the decision whether to allow impeachment is committed to the sound discretion of the trial judge). Furthermore, "[t]he trial court has broad discretion in formulating jury instructions, and its refusal to grant a request for a particular instruction is not a ground for reversal if the court's charge, considered as a whole, fairly and accurately states the applicable law." *Jung v. George Washington Univ.*, 875 A.2d 95, 110 (D.C. 2005) (internal citations and question marks omitted).

Even assuming that the trial court should have permitted Mr. Gardner to explain why he would not have talked to Mr. Cunningham at the jail, and what Mr. Gardner meant by his statement that "there was a lot of things going on, being said about [Mr. Cunningham] around the jail," we conclude that Mr. Gardner suffered no prejudice when the trial court directed him not to respond to his counsel's question, "What were those things." Defense counsel's extensive and rigorous cross-examination of Mr. Cunningham, before Mr. Gardner testified, brought out information about his (Mr. Cunningham's) reputation as a snitch. Defense counsel established, and Mr. Cunningham agreed, that "snitch" refers to someone "who testifies against another person to try to get their sentence reduced." Defense counsel also elicited an admission from Mr. Cunningham that "starting back in 1988, [he] was branded as a snitch," and he had been placed in a special unit next to the jail, with people who help the prosecution, or in maximum security when he served time in prison. Defense counsel brought out Mr. Cunningham's admission that he heard about Mr. Gardner's case on television in 2004, after he had been released from prison in mid-September 2004. He admitted that he was charged with two robberies, and that after pleading to one count he began cooperating with the government in another case. As a result he received only a 24 month sentence, even though he could have received fifteen years for robbery, given his long criminal record. After that sentence, he acknowledged that he was once again

placed in the special unit for cooperating witnesses, and subsequently met Mr. Gardner. He acknowledged that he was "hoping that the [g]overnment [would] help him get out of jail again." Defense counsel emphasized this impeachment evidence during closing argument. In short, defense counsel cast serious doubt on Mr. Cunningham's credibility and reliability as a witness. Mr. Gardner's testimony that he would not have talked to Mr. Cunningham about his case because of his reputation as a snitch would have been, at most, a small addition to the impeachment of Mr. Cunningham, and not a significant contribution to enhancing Mr. Gardner's own credibility with respect to his account of Mr. Kamara's murder.

With respect to defense counsel's request for the plea agreement instruction, Mr. Cunningham had no plea agreement with the government, as trial counsel conceded. Thus, strictly speaking, there was no evidence supporting this request, and Mr. Gardner was not entitled to the requested instruction. *See Fearwell v. United States*, 886 A.2d 95, 101 (D.C. 2005) ("[A] party is entitled to a requested instruction only if there is evidence in the record to support the request."). Moreover, the trial court gave general instructions regarding witness testimony that the jury could have applied to completely disregard Mr. Cunningham's

testimony.[25]  Under these circumstances, we discern no abuse of discretion.  *See*

*Jung*, *supra*, 875 A.2d at 110.

**Limitation of Officer Craiger's Cross-Examination**

*The Factual Context*

Officer Craiger testified at Mr. Gardner's first trial, in 2006.  Prior to his

testimony, the prosecutor, with defense counsel present, represented to the trial

---

[25]  Specifically, the trial court instructed the jury as follows:

> In reaching a conclusion as to the credibility of any witness, you may consider any matter that may have a bearing on the subject.  You may consider . . . whether the witness has any motive for not telling the truth, . . . [and] whether the witness has any interest in the outcome of this case . . . .
> ***
> You may consider the reasonableness or unreasonableness, the probability or improbability of the testimony of a witness in determining whether to accept it as true and accurate.
> ***
> If you believe that any witness has shown himself or herself to be biased or prejudiced for or against either side in this trial, you may consider and determine whether such bias or prejudice has colored the testimony of the witness so as to affect the desire and capability of that witness to tell the truth.

court that Officer Craiger was "unaware that he's being investigated by the U.S. Attorney's Office for unlawful force," but that he was aware that he had been under investigation by MPD. The prosecutor declared that the MPD investigation had been "clearly resolved" with Officer Craiger "receiv[ing] no suspension." As a result of a post-trial motion filed by Mr. Gardner following his conviction at his first trial, it became clear that the prosecutor had inaccurately stated the status of the excessive force complaint against Officer Craiger.

However, during a hearing on April 25, 2007, the trial court found that the misinformation was not intentional, and that there was "an innocent misunderstanding in the communications between the prosecutor and the police officials and the police union attorneys, including the general counsel." The court further determined that Officer Craiger's trial testimony was "a very small piece in the government's chain" of evidence, that "the only material points that Officer Craiger testified to are corroborated by everyone else, with one exception." That exception was Officer Craiger's testimony that he "heard a male voice saying he needed to get the stuff off him." The court rejected the defense argument that "the lack of DNA on [Mr. Gardner's] jacket" was attributable to Mr. Gardner's washing it off in the shower. The trial court found that there was "a significant amount of

rain" and the jacket had been left outside in the rain. The court also indicated that despite the rain, Mr. Kamara's "DNA was on the defendant's jacket."[26]

During cross-examination at Mr. Gardner's second trial, in 2011, defense counsel sought to show that Officer Craiger was not a credible witness because of two investigations of complaints against him, one for harassment and the other for excessive use of force. After objection by the prosecutor, the trial court limited the defense questions to the official finding that Officer Craiger harassed someone and MPD reprimanded him. Officer Craiger testified that MPD had investigated him for harassment.

Officer Craiger admitted that he had been under investigation in November 2006, during Mr. Gardner's first trial, for excessive use of force, but he asserted that the complaint against him "was ultimately withdrawn and [he] served no suspension days whatsoever." He claimed that he was offered a ten-day suspension but that "the case was completely withdrawn all together," and that "all complaints were taken away, so [he] served no suspension days, no disciplinary action in reference to that incident." Defense counsel pressed Officer Craiger as to

---

[26] The DNA expert actually testified that the stain on the jacket included a mixture of DNA from at least two individuals, and that Mr. Kamara could not be excluded as the "possible predominant donor to this mixture."

whether he told the prosecutor during Mr. Gardner's first trial that he had been "totally cleared without any administrative hearing." Officer Craiger responded that he did not recall what he had told the prosecutor five, six years ago. Defense counsel asserted, "the fact is you weren't totally cleared, is that right?" The trial court sustained the prosecutor's objection. When defense counsel sought a bench conference, the trial judge stated, "No, let's move on to something else." After further discussion between counsel and the trial judge, the judge declared that defense counsel established that Officer Craiger was facing disciplinary proceedings at the time of the previous trial, showing potential for bias, and thus, defense counsel had "gotten all [he was] entitled to."[27]

---

[27] When defense counsel later continued to argue that he should be allowed to impeach Officer Craiger with a December 2006 document that he signed, indicating that "he was not cleared" but had been given a ten-day suspension without pay and placed on probation, the trial court declared that "what matters [is] if [Officer Craiger's] knowingly lying." The trial judge asked the prosecutor to "look into" the matter, and "if there's no good explanation" for Officer Craiger's statement, then he would allow defense counsel to "do it" (apparently meaning to allow defense counsel to ask Officer Craiger about the document he signed in December 2006). The following day, defense counsel again broached the issue of Officer Craiger's December 2006 signed settlement document. The trial court asserted that Officer Craiger did not say that the excessive force investigation "was all over at the time of [Mr. Gardner's first] trial." Rather, Officer Craiger was referring to "the final resolution" of the excessive force complaint.

### *The Parties' Arguments*

Mr. Gardner contends that the trial court violated his Confrontation Clause rights by limiting defense counsel's cross-examination of Officer Craiger as to "his bias and his unreliability as a witness." Mr. Gardner claims that "exposing the timing of [Officer] Craiger's disciplinary proceedings and [Mr.] Gardner's first trial would have established that [Mr.] Craiger had a strong motive to exaggerate his testimony to help convict [Mr.] Gardner." Moreover, Officer Craiger's inaccurate statement that he had been "totally cleared" of the pending charges, would have undermined his reliability as a witness in general." Mr. Gardner further asserts that "it cannot be said that foreclosure of a full cross-examination was harmless" under constitutional harmless error standard. He argues that Officer Craiger's "testimony was an important piece in the government's theory that [Mr.] Gardner was the shooter and that absence of more blood or biological material on [Mr.] Gardner's person and clothes was explained by the fact that he washed it off in the motel room." The government maintains that the trial court did not commit error, but that "[e]ven if it had erred, such error was harmless under any standard of review," that is, constitutional or nonconstitutional harmless error.

*Applicable Legal Standards and Principles*


"[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) (internal citation and quotation marks omitted).  As a result, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant."[28]  *Id.*

---

[28]  "When a defendant claims that his right to cross-examination was improperly restricted, our standard of review depends on whether the trial court has permitted sufficient cross-examination to comport with the requirements of the Sixth Amendment right to confrontation."  (*Marques*) *Johnson v. United States*, 118 A.3d 199, 204 (D.C. 2015) (internal citations and quotation marks omitted).  If appellant was "wholly deprived . . . of any opportunity to cross-examine a witness or present evidence concerning bias or a central issue in the case, we may only affirm if we are convinced that the error was harmless beyond a reasonable doubt." *Id.* (internal citations and quotation marks omitted).  If, however, "the trial court's limitation of . . . cross-examination d[oes] not violate the Sixth Amendment[, we] review only for abuse of discretion." *Id.*  In the latter circumstance, we also review any error under the "less stringent test for harmless error set forth in *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)." *Clark v. United States*, 639 A.2d 76, 82 (D.C. 1993).

*Discussion*

Even assuming that the trial court erred by not allowing defense counsel to pose additional questions as to whether Officer Craiger was "totally cleared" of the excessive force accusation, we conclude that the error was harmless under the constitutional and nonconstitutional harmless error standards.[29] Defense counsel conducted a rigorous and effective cross-examination of Officer Craiger by bringing out the following. At the time of Mr. Kamara's murder, Officer Craiger was assigned to MPD's auto theft unit and did not normally work homicides. Officer Craiger listened outside of Room 114 at the Motel 6 for twenty to thirty minutes but made no effort to obtain a search warrant. Upon entering and examining Room 114, Officer Craiger saw no blood in the room – on towels or on the floor. He took no notes on the conversations he heard inside the room before he went in, even though he acknowledged that homicides are perhaps the most

---

[29] Officer Craiger also acknowledged that the excessive force investigation was pending during Mr. Gardner's first trial in November 2006. He also gave his view as to the conclusion of the investigation, including that he "served no suspension days, no disciplinary action in reference to that incident." When asked whether he had told the prosecutor during the first trial that he was "totally cleared without any administrative hearing," Officer Craiger said he did not "recall exactly what [he] said [to the prosecutor]. It's been five, six years ago." When defense counsel pressed the point by saying, "Well, the fact is that you weren't totally cleared, is that right," the prosecutor objected and the trial court sustained the objection.

serious types of crimes investigated by the MPD. Nor did Officer Craiger fill out any witness statement form, or testify before the grand jury. In fact, he did not testify about what he heard while listening at the door of Room 114 until two years later, at Mr. Gardner's first trial.

We see no reason to disturb the motions judge's finding on April 25, 2007, that Officer Craiger's testimony "is a very small piece in the government's chain" of evidence. Officer Craiger's testimony established, at most, three things: (1) Mr. Gardner said he was amped up and needed to get stuff off of him; (2) the shower in Room 114 was running; and (3) there was the sound of metal sliding on metal that Officer Craiger thought sounded like someone sliding a gun rack. We are convinced that this testimony presented minimal prejudice to Mr. Gardner. The first two pieces of Officer Craiger's testimony had minimal significance in light of Mr. Gardner's own testimony placing himself in Mr. Kamara's cab at the time of the murder, and confirming that after the murder, he got out of the cab, ran down the same alley, close to the Motel 6, where Ms. Ball saw a young man running after he exited the cab, and the same alley where the police found the silver gun linked to Mr. Kamara's murder; Mr. Gardner had the alleged third person (who allegedly murdered Mr. Kamara) running away from the direction of the Motel 6. Both Ms. Dean and Mr. Arkoful testified about Mr. Gardner's arrival at the motel

(after the murder) in an agitated or hurried state.  Officer Craiger's testimony about the sound he heard that appeared to be that made by someone sliding a gun rack was minimized by the fact that the black gun that Mr. Gardner dropped out of the window of Room 114 was not loaded; it was also minimized by Ms. Dean's grand jury testimony that earlier on the day of Mr. Kamara's murder, Mr. Gardner showed her a "[s]ilver, chrome" gun with either a black handle or "a black strip on the front."  In short, Officer Craiger's testimony was minimally prejudicial to Mr. Gardner.

Weighed against this minimal prejudice is the government's strong and compelling case, as indicated by (1) the testimony set forth (in the factual summary section of this opinion) of Ms. Ball, Ms. Dean, Mr. Arkoful, Officer Boria, and police cadet Butuche, and (2) the reasonable inferences that reasonable jurors could draw from that evidence.  We summarized the strength of the government's case earlier in this opinion.  In sum, in light of the government's strong and compelling evidence against Mr. Gardner, compared to the minimal significance of Officer Craiger's testimony, we are persuaded that any error by the trial court in limiting cross-examination of Officer Craiger would be harmless under the constitutional and nonconstitutional harmless error standards.

**The Impeachment of Mr. Gardner with His Statement to the Police**

*The Parties' Arguments*

Mr. Gardner argues that the trial court erred in finding that his initial statement to police after his arrest was voluntary and in consequently allowing the government to use it to impeach his testimony. He relies largely on the length of his detention (more than thirteen hours post-arrest); the fact that he was shackled in a small (eight feet by eight feet), cold room wearing nothing but a paper suit; the failure of police to feed him for hours after he initially requested food; and his own behavior during his statement, including shivering, sniffling, crying, and his expression of a desire to go home. The government argues that Mr. Gardner's will was not overborne, and hence, his statement was not the product of coercion; the government respected his initial invocation of his right to silence; the police never told Mr. Gardner that they were withholding food until he responded to their questions; the police turned off the vent when they saw Mr. Gardner shivering; and Mr. Gardner's statement to the police was not involuntary.

### *Applicable Legal Standard and Principles*

"Voluntary statements are admissible to impeach a defendant's trial testimony." *United States v. Turner*, 761 A.2d 845, 853 (D.C. 2000). Although the government must prove voluntariness by a preponderance of the evidence and we review the trial court's finding of voluntariness *de novo* and supporting factual findings "for clear error," we also view the evidence in the light most favorable to sustaining the trial court's ruling. *Id*. To determine whether a statement is voluntary, we look to "whether, under the totality of the circumstances, the will of the suspect was overborne in such a way as to render his confession the product of coercion." *Id.* at 854 (internal alteration, citations, and quotation marks omitted). The factors we examine "in determining voluntariness include the circumstances surrounding the questioning, the accused's age, education, and prior experience with the law, his physical and mental condition at the time the statement was made, other factors showing coercion or trickery, and the delay between the suspect's arrest and confession." *Id*. (citation omitted).

*Discussion*

Mr. Gardner was held for a long time with no apparent police activity, primarily because he was left alone to sleep off his drug-induced high for hours.[30] It was not until over ten hours into his confinement that he was found by the lead detective to be awake and responsive. Although his request for food was not immediately granted, he was not led to believe it would not be honored unless he gave a statement, and he did not renew his request prior to or during his statement to police. Moreover, it was Mr. Gardner who indicated he wished to talk with police,[31] and he waived his rights in writing.

Throughout the questioning by the detectives, Mr. Gardner admitted being in Mr. Kamara's cab, and being with his brother and Ms. Dean, but denied having a gun and denied shooting Mr. Kamara, even though the detectives accused him of

---

[30] After about two hours of being alone, he was awakened; his eyes were glassy. He asked for a lawyer, and was given his *Miranda* warnings. The police posed no questions about the case and he continued sleeping.

[31] Indeed, the police did not in any way attempt to interrogate Mr. Gardner until he indicated his desire to talk, materially distinguishing this case from *Dorsey v. United States*, 60 A.3d 1171, 1178-86 (D.C. 2013), on which Mr. Gardner heavily relies. Mr. Gardner again was given his *Miranda* rights before any questions were posed about the case; he waived his rights. After about forty minutes of questioning, Mr. Gardner invoked his right to stop talking and the session ended.

lying, told him that a lot of people had witnessed him shooting Mr. Kamara, that blood was on the jacket he threw out of the motel window, and further accused him of not coming to the door of Room 114 but instead jumping out of the motel window, because he knew he had shot Mr. Kamara. Mr. Gardner maintained that while he was getting money out of his pocket to pay the cab driver, a man pointed a gun at him and demanded his money. He struggled with the man, grabbed his arm, and tried to make him drop his gun. The cab driver attempted to speed off but the man shot him.[32]

We conclude that Mr. Gardner's statement was not involuntary. During his statement, when police saw him "shaking" from cold, they "turned the vent off." Further weighing against Mr. Gardner are the facts that (1) he had previous

---

[32] During cross-examination of Mr. Gardner at trial, the prosecutor used the 2004 police interview in an attempt to impeach Mr. Gardner about the following: (1) his failure to tell the police that he put the money he pulled out to pay Mr. Kamara back in his pocket (no money was found in the taxi after Mr. Kamara's murder); (2) the failure to tell the police that the alleged third person pointed the gun at Mr. Kamara rather than at Mr. Gardner (at trial Mr. Gardner testified that the gun was pointed at Mr. Kamara when he, Mr. Gardner, grabbed the third person's arm); (3) the directions in which the third person and Mr. Gardner ran after Mr. Kamara was shot (during the police interview Mr. Gardner said he did not know in which direction he ran when he left the cab but he testified at trial that he ran through the alley); (4) although Mr. Gardner stated at trial that when he returned to the motel, he told his brother that someone tried to rob him, he told the police in his 2004 statement that after he returned to the motel, he "just couldn't talk"; and (5) his 2004 denial that he had a black gun (at trial he stated that the black gun was his).

experience with the criminal justice system, (2) he was a young adult at the time, but not so young that he was easily influenced or intimidated by sitting alone and sleeping in a room for hours, and (3) there is no evidence that police used any physical or unduly coercive psychological tactics on him during his confinement. Despite the police statements about other witnesses to Mr. Kamara's murder and assertions that none of these other witnesses saw a third person by the cab, Mr. Gardner steadfastly denied that he had shot Mr. Kamara, and insisted that a third party did the shooting. Considering the totality of these facts and circumstances, we agree with the first trial judge that "there was not any type of involuntariness that would result in a statement being precluded for all purposes."[33] In short, based on our review of the police interview with Mr. Gardner, and the factual findings of the trial court, we conclude that Mr. Gardner's "will . . . was [not] overborne in such a way as to render his confession the product of coercion," *Turner*, *supra*, 761

---

[33] In its initial ruling on October 25, 2006, on the motion to suppress, the trial court focused solely on the delay in presentment, finding it to be unreasonable. In making that finding, the court stated that "because of the unreasonable delay the statements likewise are involuntary." However, on November 7, 2006, the court declared that it should not have used the word "involuntary," that its finding was confined to the delay in presentment. The court found "that there was nothing in the conduct of the police that resulted in an involuntary statement in this case." Prior to the second trial, defense counsel also filed a motion to suppress Mr. Gardner's statements for all purposes. The motions judge essentially stated that he was bound by the initial factual finding and the law of the case and denied the motion after discussing it with defense and government counsel.

A.2d at 853; hence, the trial court did not err in allowing the government to use Mr. Gardner's statement to impeach his testimony at trial.[34] *Id*.

**Ineffective Assistance of Counsel**

*The Parties' Arguments*

Mr. Gardner contends that his trial counsel was constitutionally ineffective because he failed to (1) cross-examine Mr. Watkins on the reliability of his expert opinion;[35] (2) object to police statements, during the November 2004 questioning of Mr. Gardner, that there were witnesses to the shooting of Mr. Kamara, and that no one mentioned a second man standing next to the cab;[36] and (3) proffer a basis

---

[34] In the next section of this opinion, Ineffective Assistance of Counsel, we discuss Mr. Gardner's arguments about the statements police made to him during the 2004 police interview.

[35] Mr. Gardner argues that his trial counsel was constitutionally ineffective because he failed to cross-examine Mr. Watkins, on the reliability of his opinion, by using the NRC Report (mentioned earlier in this opinion) to question him "about the subjective nature of his conclusions, the lack of specified standards for determining a match, the lack of safeguards against bias, or the lack of research demonstrating the ability to determine the uniqueness of firearms evidence in the first place."

[36] Mr. Gardner claims that his counsel rendered ineffective assistance of counsel by failing to object to the admissibility of false statements made by the

(continued…)

for questioning Mr. Gardner about information given him concerning Mr. Cunningham's status as a snitch.[37] The government contends that Mr. Gardner failed to show "that any deficiency in counsel's performance prejudiced him."

---

(…continued)

police during his 2004 police interview. Specifically, he cites the following statements: (1) "There's people that saw the shooting occur, okay, and they don't say anything about a dude in a black hoody sticking a gun all the way across and shooting the gun and running. They don't say anything about that"; (2) "Now explain it because people don't say anything when the shooting occurs about a dude standing next to the cab. Nobody says it. You're the only one . . . ." Mr. Gardner contends he was substantially prejudiced because these statements "misinformed the jury on a critical point that directly contradicted and undermined [his] account of the evidence, and no effort was made to correct the evidence." He maintains that the jury may not have known that police tactics such as lying, trickery, or exaggeration "are generally permissible." Hence, "the jury may well have believed that the police officers' statements as to [him] were true, and that there were in fact witnesses to the shooting who contradicted his account that some other person shot [Mr.] Kamara, even if such witnesses did not personally testify at trial."

[37] Mr. Gardner complains that his trial counsel rendered ineffective assistance by failing to make a proffer to the trial court about the relevance of an unexpected answer to a question he posed to Mr. Gardner about his knowledge of Mr. Cunningham's reputation as a jailhouse snitch. He asserts that if he "had been able to tell the jury that he knew of [Mr.] Cunningham's reputation as a jailhouse snitch, the jury might well have rejected [Mr.] Cunningham's testimony entirely, and the outcome of the case might have been different."

*Applicable Legal Standards and Principles*

We review a trial court's denial of a § 23-110 motion for abuse of discretion, *Wright v. United States*, 979 A.2d 26, 30 (D.C. 2009), assessing the trial court's findings of fact for clear error and determinations on questions of law *de novo*, *Jenkins v. United States*, 870 A.2d 27, 33-34 (D.C. 2005). A criminal defendant claiming ineffective assistance of counsel "must prove both incompetence and prejudice." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986) (citing *Strickland v. Washington*, 466 U.S. 668, 688 (1984)). To prove incompetence, the defendant must "show[] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. To prove prejudice, the defendant must "show[] that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. Specifically, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011) (citing *Strickland*, *supra*, 466 U.S. at 693). It is not essential to examine both the performance and the prejudice prongs of an ineffective assistance claim. *Strickland*, *supra*, 466 U.S. at 697. "If it is easier to dispose of an

ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id*.

### *Discussion*

As indicated, to establish ineffective assistance of counsel, Mr. Gardner must prove both constitutionally deficient performance by counsel and prejudice. However, as *Strickland* makes clear, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Id*. at 697. In light of that legal principle, as well as the record before us, we need not determine whether Mr. Gardner's trial counsel rendered constitutionally deficient representation because we are convinced that Mr. Gardner has not shown a reasonable probability or a substantial likelihood that the outcome of the proceeding against him would have been different. *See Harrington*, *supra*, 562 U.S. at 112.

First, we are unable to conclude that cross-examination of Mr. Watkins by using the NRC Report, in place of the trial strategy that defense counsel followed to discredit Mr. Watkins' unqualified opinion, would have produced a different result in Mr. Gardner's trial. As the trial judge declared in ruling on Mr. Gardner's

D.C. Code § 23-110 motion, Mr. Gardner's trial counsel "effectively counter[ed] the conclusions presented by the expert witness, and there is no assurance that the trial strategy that [Mr. Gardner] now proposes would have been any more effective." In particular, our review of defense counsel's cross-examination of Mr. Watkins shows that he was particularly effective in focusing on the mass production of reloaded bullets and getting Mr. Watkins' agreement that "there could potentially be millions of reloaded bullets with the same marking," and that he could not "say at all how many bullets were made with the[] particular markings" that characterized the ballistics evidence in this case. More important to the outcome of this case was the other strong and compelling evidence tying Mr. Gardner to the silver gun, evidence that we recounted earlier in this opinion. Therefore, in light of the strength of the government's case against Mr. Gardner, even if we were to determine that defense counsel's failure to use the NRC Report to cross-examine Mr. Watkins constituted an unprofessional error, we could not conclude that the error was " so serious as to deprive [Mr. Gardner] of a fair trial, a trial whose result is reliable," *Strickland*, *supra*, 466 U.S. at 687, or that "there is a reasonable probability" that the outcome of Mr. Gardner's trial "would have been different." *Id*. at 694.

Second, we agree with the trial court's analysis of the specific interview statements made by the police that the prosecutor used to impeach Mr. Gardner, and the court's conclusion in its § 23-110 order that "[a]ny possible prejudice . . . does not rise to the level of ineffective assistance." The motions judge, who also presided over Mr. Gardner's 2011 trial, found that "[t]he statements were but a brief part in a lengthy cross-examination and were introduced to contextualize [Mr. Gardner's] responses." Importantly, "[t]he jury was instructed not to consider information introduced for impeachment purposes as evidence." As the motions judge found, "[t]he statements were never again raised or alluded to during the course of the trial, and neither party's closing statement made any mention of them." Given the trial court's instruction to the jury, we agree that "the jury could not have reasonably interpreted the [police interview] statements as evidence of the truth" that there were in fact other witnesses to Mr. Kamara's murder. In short, we agree with the motions judge that "there is no reason whatsoever to think that [Mr. Gardner] was prejudiced by the[] introduction" of the identified statements at trial."

Third, as we indicated earlier in this opinion, in response to defense counsel's question on cross-examination, Mr. Cunningham explicitly admitted that he had a reputation for being a jailhouse snitch. Thus, Mr. Gardner's testimony

that he knew of Mr. Cunningham's reputation as a snitch would have had at most a small, incremental impeachment effect on Mr. Cunningham's testimony. Moreover, we perceive no likelihood of sufficient prejudice because Mr. Gardner's assertion that he knew of Mr. Cunningham's reputation as a snitch would have been unsubstantiated. In short, we are convinced that Mr. Gardner has failed to satisfy the prejudice prong of his ineffective assistance of counsel claim.[38] *See Strickland, supra*, 466 U.S. at 687.

Accordingly, for the foregoing reasons, we affirm Mr. Gardner's convictions for first-degree felony murder while armed and the related PFCV and CPWL

---

[38] Mr. Gardner argues that that the cumulative effect of the alleged errors, preserved and unpreserved, requires reversal of his convictions. "'[I]ndividual errors, not warranting reversal, may when combined so impair the right to a fair trial' that reversal is required." *Smith v. United States*, 26 A.3d 248, 264 (D.C. 2011) (quoting *Foreman v. United States*, 792 A.2d 1043, 1058 (D.C. 2002)). To determine whether reversal is warranted, we evaluate "whether the cumulative impact of the errors substantially influenced the jury's verdict." *Id.* (internal quotation marks omitted). In making this evaluation, we weigh "the significance of the alleged errors and their combined effect against the strength of the prosecution's case." *Id.* (internal quotation marks omitted). *See also Hagans v. United States*, 96 A.3d 1, 44 (D.C. 2014) (discussing mixed alleged errors – such as preserved constitutional, preserved non-constitutional, and unpreserved errors). We have concluded that virtually all of the alleged errors in this case, or errors that we have assumed *arguendo*, require no reversal. As we said in *Hagans*, "[o]ur assessment of the strength of the government's case and the innocuousness (as we have discussed) of the few errors we have found or assumed *arguendo* convinces us that, even in combination, and even applying [a constitutional harmless error] standard across the board, there is no reasonable possibility the errors affected the outcome of [Mr. Gardner's] trial." *Id*. at 44 (footnote omitted).

convictions, but we remand this case so that the trial court may vacate as merged Mr. Gardner's conviction for attempted armed robbery and the related PFCV conviction.

*So ordered.*