*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

Nos. 14-CO-0978 & 23-CO-0507

ANTHONY FALTZ, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court of the
District of Columbia
(2006-CF1-004490)

(Hon. Erik P. Christian, Motions Judge)

(Argued May 14, 2024                    Decided July 11, 2024)

*James Millikan*, with whom *Leslie W. Kostyshak*, *Matthew J. Revis*, and *Destiny T. Stokes* were on the brief, for appellant.

*David P. Saybolt*, Assistant United States Attorney, with whom *Matthew M. Graves*, United States Attorney, *Chrisellen R. Kolb*, and *Kacie Weston*, Assistant United States Attorneys, were on the brief, for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and EASTERLY and SHANKER, *Associate Judges*.

BLACKBURNE-RIGSBY, *Chief Judge*: Appellant Anthony Faltz and two friends were driving a stolen Ford Crown Victoria in February 2002. While fleeing from police, they ran a red light and crashed into another car, killing two people. Metropolitan Police Department ("MPD") officers on the scene identified Dorrell

Ingram as the driver of the car and the government filed murder charges against him. After a DNA sample from the center of the driver's-side airbag was found to contain DNA from Mr. Faltz, however, the government dropped charges against Mr. Ingram and brought a second-degree murder charge against Mr. Faltz. At the encouragement of his appointed trial counsel, Mr. Faltz pled guilty to two counts of involuntary manslaughter.

Mr. Faltz seeks review of the trial court's denial of his motion to vacate his convictions and sentence pursuant to the Innocence Protection Act ("IPA"), D.C. Code § 22-4135, as well as his claim of ineffective assistance of trial and post-conviction counsel ("IAC"), pursuant to D.C. Code § 23-110. Mr. Faltz also appeals the trial court's denial of his motions to exclude two accident-reconstruction experts presented by the government. We affirm the trial court's denial of Mr. Faltz's IAC claims; however, we remand the case for further analysis of the evidence Mr. Faltz presented of his innocence and, relatedly, the admissibility of the government's accident-reconstruction experts under *Motorola Inc. v. Murray*, 147 A.3d 751 (D.C. 2016) (en banc).

## I.     Factual Background & Procedural History

### A.     Car Chase and Accident

On February 19, 2002, Anthony Faltz and twin brothers Dorrell and Darryl Ingram crashed a stolen Ford Crown Victoria car into the passenger side of a Nissan Maxima while fleeing police, killing the two people inside the Nissan.  Mr. Faltz testified that the Ingram brothers stole the Crown Victoria and then picked Mr. Faltz up from his house; each of them then took turns driving the car for several hours. On their way back to Mr. Faltz's house, a police cruiser approached.  Moving away from the police vehicle, the Crown Victoria hit a parked vehicle and then a marked police car before speeding off into a full-blown chase.  The Crown Victoria then ran a red light and crashed, killing the two people in the other car.

There are conflicting accounts as to who was driving the Crown Victoria at the time of the accident.  During the 2022 hearing on his IAC and IPA claims, Mr. Faltz testified that Dorrell Ingram was driving the Crown Victoria when they first spotted the police cruiser and during the crash.  At the 2022 hearing, he testified to being "probably behind the driver or sitting in the middle."  He also testified that he had been leaning slightly forward during the chase, was thrown forward during the collision, and did not know whether he hit the driver's-side airbag.  Mr. Faltz

stated that after the crash he attempted to get out through the right rear passenger door but an injury to his right hip prevented him from getting far.

The MPD officers present at the scene identified the driver as Dorrell Ingram, who fled on foot before police apprehended and arrested him. Officers Gregory Phifer and Herman Hodges witnessed the accident from one or two blocks away and reached the vehicle within seconds of the crash. Officer Phifer later testified that he immediately grabbed the rear passenger emerging from the passenger side of the car and dragged him to the driver's side. Both officers testified that they saw the driver emerge from the driver's seat and run into a nearby wooded area. Officer Phifer apprehended both passengers and then stayed with them and the vehicle. He then described the fleeing suspect to a third officer, Officer Byron Purnell, who had subsequently arrived. While canvassing the area, Officers Purnell and Hodges saw someone fitting Officer Phifer's description of the fleeing driver and arrested him, later identifying him as Dorrell Ingram. The MPD officers also identified the rear passenger as Mr. Faltz and the front passenger as Darryl Ingram. After arriving at the scene, MPD Detective Kimberly Metivier instructed Officer Phifer to write out his descriptions of the Ford's occupants and where they exited the vehicle. In written reports, Detective Metivier noted that Dorrell Ingram was identified as the driver "[d]ue to the overwhelming available physical evidence and witness observations."

The government charged Dorrell Ingram with second-degree murder as the driver of the car. However, the government reversed course after DNA testing by the FBI, conducted using technology available at the time, excluded Dorrell Ingram as a DNA contributor to a sample recovered from the driver's side airbag and showed that Mr. Faltz's DNA could not be excluded as a match. The FBI's lab report also stated that the specimen "contained DNA from more than one individual." Mr. Faltz was then charged with second-degree murder and all charges against the Ingram brothers were dropped.[1]

## B. Guilty Plea (2006)

Once charged, the court appointed Ferris Bond to represent Mr. Faltz. Mr. Faltz later testified that he told Mr. Bond he was not the driver and thus wanted to go to trial. On the morning of jury selection for the trial, the prosecutor offered Mr. Faltz a plea offer for two counts of involuntary manslaughter. Mr. Faltz later testified that he agreed to the deal because Mr. Bond told him both that his DNA

---

[1] Dorrell Ingram subsequently filed a civil suit against the District of Columbia and various MPD officers alleging malicious prosecution and violations of his Fourth Amendment rights, among other claims. The United States District Court for the District of Columbia found that the defendants were entitled to summary judgment on all of Mr. Ingram's claims. *Ingram v. District of Columbia*, No. 1:04-cv-00505-PLF, 2005 WL 3174624 (D.D.C. Oct. 5, 2005).

was all over the airbag and that he would likely receive a maximum fifteen-year total sentence.

Before sentencing, Mr. Faltz provided a statement to the writer of his Presentence Report ("PSR") maintaining that he was not the driver. When the writer asked why he pled guilty if he was not driving, Mr. Faltz responded "I didn't think it was a winnable case." On December 8, 2006, Mr. Faltz was sentenced to sixteen years on each count of involuntary manslaughter, to run consecutively, for a total of thirty-two years of incarceration.

### C. Initial Section 23-110 Proceedings

In 2009, Mr. Faltz filed a pro se motion under D.C. Code § 23-110 alleging ineffective assistance of counsel by Mr. Bond and seeking to vacate his convictions and sentence. Mr. Faltz argued that Mr. Bond was ineffective because he failed to obtain discovery from the government, conduct a proper pre-trial investigation, discuss a defense strategy for trial, describe the elements of the charges in the indictment and the guilty plea, or explain to Mr. Faltz the possibility of consecutive rather than concurrent sentences for the two involuntary manslaughter charges in the plea offer. Daniel Harn was appointed as Mr. Faltz's counsel for his Section 23-110 claim. Mr. Harn filed a supplemental motion to withdraw Mr. Faltz's guilty plea on

the grounds that his plea was not knowing and voluntary due to Mr. Bond's ineffective assistance.

At an April 25, 2011, evidentiary hearing on the Section 23-110 motion, and in supplemental motions, both Mr. Bond and Mr. Faltz testified. Mr. Faltz testified that though he understood that he was being charged as the driver of the car, he thought he was pleading to being a passenger in the car. Mr. Bond disputed Mr. Faltz's claims that he had not explained the elements of the charges or plea deal and that he had promised the deal would lead to a shorter sentence. Additionally, he stated that he had hired an investigator to speak with the Ingram family, talk with the owner of the stolen vehicle, and speak with Mr. Faltz's mother. Mr. Bond also testified that after the prosecutor told him that Mr. Faltz's DNA was "all over" the airbag, he did not consult any experts nor follow up as to how much DNA was actually found on the airbag. During the hearing, Mr. Harn, Mr. Faltz's appointed post-conviction counsel, also did not present any DNA or accident-reconstruction experts.

On April 9, 2013, the trial court rejected Mr. Faltz's claims that Mr. Bond had provided him constitutionally ineffective assistance and that his guilty plea should be withdrawn because he never admitted to being the driver of the car. Citing Mr. Faltz's understanding of the charges against him and the range of possible

sentences, as well as his failure to present evidence that Mr. Bond's investigation was deficient, the trial court found that Mr. Faltz had not established prejudice sufficient to substantiate an ineffectiveness claim. *See Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). The trial court also rejected Mr. Faltz's assertion that he had established a sufficient basis to withdraw his guilty plea, finding that a reasonable juror could conclude from the DNA evidence that Mr. Faltz was the driver and that Mr. Faltz's "admission of guilt" and failure to challenge his role as the driver in open court indicated that he understood the charges against him.

### D.     Additional DNA Testing

On April 7, 2015, after seeing a March 6, 2015, *Washington Post* article calling into question DNA results from the District of Columbia's crime lab, Mr. Faltz filed a pro se motion pursuant to the IPA, D.C. Code § 22-4135, requesting that the DNA evidence in his case be re-tested.

In June 2016, fourteen years after the original FBI testing of the DNA on the airbag, a private forensics laboratory—Bode Cellmark—re-tested the DNA from the Crown Victoria's driver's-side airbag. Bode's report confirmed that Mr. Faltz's DNA was on the airbag, and it identified a second sample on the right edge of the airbag with DNA profiles of at least two people. Because of the quality of the

sample, however, Bode did not interpret the results to identify the specific contributors to the DNA sample.

Mr. Faltz, through new counsel, approached expert Dr. Norah Rudin to interpret the second sample using a cutting-edge method called "probabilistic genotyping," which assigns likelihoods to DNA profiles rather than a binary "match/no match" approach. The probabilistic genotyping approach was not available in 2002 when the FBI first tested the DNA found on the Crown Victoria's airbag. Dr. Rudin found that evidence supporting the presence of Dorrell Ingram's DNA in the second sample from the edge of the airbag was "about 100 times stronger" than that of Mr. Faltz.

### E. IPA and Additional IAC Claims

With the discovery of the new DNA evidence interpreted by Dr. Rudin, Mr. Faltz continued to pursue his IPA claim alongside additional claims for ineffective assistance of counsel pursuant to D.C. Code § 23-110 against both his trial counsel, Mr. Bond, and his post-conviction counsel, Mr. Harn. For Mr. Bond, Mr. Faltz added an IAC claim for his failure to investigate the forensic DNA evidence and the physics of the accident. Mr. Faltz claimed that Mr. Harn's identical failures prevented Mr. Faltz from being able to establish an IAC claim against Mr. Bond.

At the hearing on the IPA and additional IAC claims, from November 15-17, 2022, the parties submitted a joint stipulation containing the testimony of the police officers who responded to the crash, several of whom identified Dorrell Ingram as the driver of the Crown Victoria. In addition to reiterating the statements he made at his first Section 23-110 hearing in 2011, Mr. Faltz testified that Mr. Harn never mentioned the possibility of retaining expert witnesses for the Section 23-110 proceedings. He also reiterated that he pled guilty because he had been told that his DNA was all over the airbag and that the Ingram twins were planning to testify that he was the driver; he testified that he would not have pled guilty if he had known that Dorrell Ingram's DNA was also present on the airbag.

Mr. Faltz presented the testimony of three expert witnesses. One expert, Stephen Mercer, testified that the representation of both Mr. Bond and Mr. Harn fell below professional standards for defense attorneys due to their failure to scrutinize the DNA report. Dr. Rudin also testified as an expert about her interpretation of the DNA sample using probabilistic genotyping. After her testimony, the government presented another DNA expert, Dr. Bruce Budowle, who critiqued Dr. Rudin's methodology for crediting false "peaks" in the sample. Though Dr. Budowle disputed aspects of Dr. Rudin's approach and the comparative strength of the two profiles, he agreed that Dorrell Ingram was a likely contributor, along with Mr. Faltz, to the sample on the edge of the airbag.

On the issue of accident reconstruction, Mr. Faltz presented expert C. Gregory Russell and the government presented two expert witnesses, Michael Miller and Brian Chase. Mr. Miller responded to the crash in his then-role as an MPD officer in the Major Crash Investigations Unit. Though he did not perform an accident reconstruction on the night of the collision, he did note his observations of the crash and vehicles and made a field sketch of the accident scene. Mr. Miller returned to the scene of the crash in May 2006, approximately four years later, to map the accident and create a report. He testified, as his report stated, that the Crown Victoria rotated after the airbags had fully inflated, and not before, which would indicate that the driver would have hit the airbag head-on and not on the side. Mr. Chase, who is the founder and chief investigator at Comprehensive Motor Vehicle Services and Consulting, testified that the Crown Victoria's airbag, within 100 milliseconds of impact, would have deployed before any rotation occurred, meaning that the driver could not have missed hitting the airbag. In contrast, Mr. Russell testified that the evidence of the crash suggests that the Crown Victoria moved in a forward diagonal motion, where a rear passenger with no seatbelt, like Mr. Faltz, would have hit the driver's airbag and the driver would have likely hit the side of the airbag or missed it altogether. Further, Mr. Russell testified that any saliva, sweat, or blood droplets from the rear passenger and driver would have followed the same trajectories.

The trial court rejected Mr. Faltz's IPA claims, emphasizing the pre-sentencing letter Mr. Faltz wrote to the court expressing remorse at being "the cause" of killing the two people in the Nissan. The trial court declined to address Mr. Faltz's IAC claim against Mr. Bond, stating that it had already done so in its April 9, 2013, order. Additionally, the trial court found Mr. Faltz's IAC claims against Mr. Harn to be meritless because Mr. Faltz "has repeatedly acknowledged his guilt in this matter." As to the additional DNA evidence, the trial court found that even if the evidence Mr. Faltz raised could be classified as new, it did not prove that he was more likely than not actually innocent. In particular, the trial court credited Mr. Chase's testimony that "it would be impossible for the driver to miss the center of the driver-side airbag."

## II. Discussion

### A. IAC Claims

We review a Section 23-110 motion for abuse of discretion, evaluating the trial court's factual findings for clear error and its legal determinations de novo. *Gardner v. United States*, 140 A.3d 1172, 1195 (D.C. 2016). A counsel's performance is constitutionally ineffective if their errors, falling "below an objective standard of reasonableness," prejudice their client. *Strickland*, 466 U.S. at 688. A defendant who pled guilty can establish that their counsel was constitutionally

ineffective by establishing a "reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Lee v. United States*, 582 U.S. 357, 364-65 (2017) (quoting *Hill v. Lockhart*, 474 U.S. 52, 59 (1985)).

Mr. Faltz argues that Mr. Bond's failure to consult DNA and accident-reconstruction experts left him without a viable defense to the centerpiece of the government's case against him, and thus drove him to accept the plea offer despite his innocence. Mr. Faltz also contends that Mr. Harn's identical failure to engage DNA or accident-reconstruction experts precluded him from establishing an IAC claim against Mr. Bond. Even if we were to agree with Mr. Faltz that both his trial counsel[2] and post-conviction counsel[3] performed deficiently, we are not

[2] At a status hearing ahead of the 2022 evidentiary hearing, the government challenged Mr. Faltz's IAC claims against Mr. Bond as successive and, after hearing arguments from both parties, allowed Mr. Faltz's claims against Mr. Bond to proceed. In its final order, however, the trial court stated that it had already considered Mr. Faltz's IAC claims against Mr. Bond in its initial Section 23-110 proceeding and "w[ould] not consider claims of ineffective assistance of counsel against Mr. Bond in this Order." The government argues again on appeal that Mr. Faltz's IAC claims against Mr. Bond are procedurally barred as a successive motion. The trial court's final order implicitly deems Mr. Faltz's claims against Mr. Bond to be successive, but because it does not make an explicit finding as such, we decline to do so here. Instead, because of the inextricable nature of Mr. Faltz's claims against Mr. Bond and his post-conviction counsel, all of which the parties briefed, we review Mr. Faltz's IAC arguments against Mr. Bond and affirm.

[3] The government notes that we have not explicitly held there to be a constitutional or statutory right to effective assistance of counsel in Section 23-110

convinced that Mr. Faltz provided sufficient evidence of prejudice to substantiate his IAC claims. Accordingly, we do not address the possible deficiency of either attorney's performance. *See Dorsey v. United States*, 225 A.3d 724, 728 (D.C. 2020) ("[I]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice[,] . . . that course should be followed" (quoting *Strickland*, 466 U.S. at 697)). We first address Mr. Faltz's claim against his trial counsel, Mr. Bond, and then turn to his claim against his post-conviction counsel, Mr. Harn. For both claims, we conclude that there was not a reasonable probability that, but for the errors of each attorney, Mr. Faltz would not have pled guilty. *Lee*, 582 U.S. at 364-65.

We are not persuaded that, but for Mr. Bond's failure to engage DNA or accident-reconstruction experts at the pre-trial stage, Mr. Faltz would have insisted on going to trial. It is true that the FBI's DNA report, which Mr. Bond received, stated that the sample "contained DNA from more than one individual," which is a fact that Mr. Faltz claims Mr. Bond never shared with him. But Mr. Faltz undisputedly remained the major contributor to the DNA sample from the center of the airbag, the only sample at issue at the time. We see no evidence to suggest that

---

proceedings where there is no pending appeal. We assume without deciding here that Mr. Faltz's claims against his collateral counsel are reviewable, though we ultimately affirm the trial court's denial of Mr. Faltz's IAC claims.

consultation with DNA or accident-reconstruction experts, within the confines of then-available technology, would have altered the FBI lab report's findings. Further, though the DNA evidence was essential to the government's case against Mr. Faltz, its potential weaknesses were not necessarily central to Mr. Faltz's defense. As Mr. Bond emphasized during his testimony at the first Section 23-110 hearing, "every police witness the government was going to call at one time or another had indicated that Mr. Ingram had been driving and Mr. Ingram had actually committed the offense." The circumstances of Mr. Faltz's guilty plea are distinct from that of the defendant in *Lee*, 582 U.S. at 362, where the parties did not dispute that Mr. Lee would have proceeded to trial if his attorney had properly advised him of the deportation consequences of a guilty plea. There is no such clarity here. Given the results of the FBI's DNA lab report, in light of contemporaneous technological limitations and the strength of eyewitness accounts for Mr. Faltz's defense, we conclude that Mr. Faltz has not established that there is a reasonable probability that he would have insisted on going to trial if Mr. Bond had only consulted with DNA or accident-reconstruction experts.

We similarly conclude that Mr. Faltz falls short of demonstrating prejudice for his IAC claim against Mr. Harn, which hinges on the merits of his IAC claim against Mr. Bond. Mr. Faltz contends that Mr. Harn's failure to consult DNA or accident-reconstruction experts during the first Section 23-110 hearing, like

Mr. Bond before him, prejudiced his case against Mr. Bond. Indeed, in denying Mr. Faltz's first Section 23-110 motion against Mr. Bond, the trial court determined that Mr. Faltz had "failed to present any witnesses or evidence which would demonstrate that a better investigation could have been performed." IAC claims rely on establishing a counterfactual under which a trial's outcome—or, as here, a defendant's decision to plead guilty—might differ. However, even with the benefit of the second Section 23-110 hearing that *did* provide a counterfactual to Mr. Bond's investigation, we conclude, as described above, that Mr. Faltz did not sufficiently establish that consulting DNA or accident-reconstruction experts would have affected his decision to plead or the first Section 23-110 hearing. Because we are unconvinced that there is a reasonable probability that, but for Mr. Bond's failure to consult DNA or accident-reconstruction experts, Mr. Faltz would have decided *not* to plead guilty, we also conclude that Mr. Harn's subsequent failure to engage such experts did not prejudice Mr. Faltz.

## B. IPA Claim

Mr. Faltz argues that the trial court improperly admitted the testimony of the government's accident-reconstruction experts—Mr. Miller and Mr. Chase—and, separately, contends that the trial court violated his due process rights by wrongly relying on his plea as evidence of his guilt. Under our reading of the record, the

nexus between evidence of Mr. Faltz's innocence—including his guilty plea—and the admitted expert testimony is such that we must consider both issues together in reviewing the trial court's assessment of Mr. Faltz's IPA claim. We conclude that a remand is necessary to conduct an analysis of the admissibility of the government's proffered expert testimony under *Motorola Inc. v. Murray*, 147 A.3d 751 (D.C. 2016) (en banc),[4] and for the trial court to grapple with the full set of evidence that Mr. Faltz presented of his innocence.

We review a claim of error in admitting expert testimony for abuse of discretion, affording the trial court "a great degree of deference." *Lewis v. United States*, 263 A.3d 1049, 1059, 1064 (D.C. 2021). However, the trial court errs if it acts "for an improper or legally insufficient reason, if its ruling lacked a firm factual foundation, or if the trial court otherwise failed to exercise its judgment in a rational

---

[4] We do not agree with the government's contention that *Dyas v. United States*, 376 A.2d 827 (D.C. 1977), rather than *Motorola*, governs the standard for expert admissibility here because Mr. Faltz's conviction was final at the time of the relevant 2022 evidentiary hearing. For this proposition, the government cites to *Gathers v. United States*, 977 A.2d 969, 972-73 (D.C. 2009), which held that a recent Supreme Court case decided after the defendant's conviction—one that would have excluded key evidence—did not apply retroactively on collateral review. Unlike in *Gathers*, where the retroactivity in question was of a decision central to the defendant's conviction, the admissibility of the government's experts at the 2022 evidentiary hearing has no bearing whatsoever on any of Mr. Faltz's pre-trial proceedings or guilty plea. Accordingly, we see no reason why *Motorola* would not govern the admissibility of experts at an evidentiary hearing that took place after it was decided.

and informed manner." *Hinton v. United States*, 979 A.2d 663, 683-84 (D.C. 2009) (internal quotations omitted). In deciding the admissibility of an expert, the trial court considers whether:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

*Motorola*, 147 A.3d at 756 (quoting Fed. R. Evid. 702) (abrogating *Dyas*, 376 A.2d at 827, and holding that the standard articulated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) governs the admission of expert testimony in civil and criminal cases).

In denying Mr. Faltz's motions to exclude the government's accident-reconstruction expert testimony, the full extent of the trial court's analysis was as follows:

> I'm going to deny that one – request to exclude their testimony. That goes more to the weight versus the admissibility of these witnesses. If Detective Miller – there's testimony that he was perhaps – he was on the scene and he's able to provide that testimonial evidence, and if the defense's expert is relying upon the reports of

other experts, including Miller and Chase, then I don't see why they should be excluded.

The trial court's written order does not substantively address the admissibility of the experts' testimony. In dismissing Mr. Faltz's motion to exclude the government's accident-reconstruction witnesses, the trial court appears to state only that Mr. Faltz concedes the reliability of the government's witnesses because his own expert relied on the same reports. But we see no evidence in the record demonstrating that Mr. Faltz's accident-reconstruction witness relied on the Miller report. By making a conclusory statement that the testimony of Mr. Miller and Mr. Chase went to weight rather than admissibility, without engaging in any further analysis, the trial court fell short of its gatekeeping role in admitting expert testimony under *Motorola*. 147 A.3d at 755-56. The government contends that all the evidence from experts on both sides was laid out in the hearing and, thus, the trial court implicitly conducted an admissibility analysis. But *Motorola* states that Rule 702 "expressly requires" the trial court to determine whether an expert reliably applied principles and methods to the case at hand, *id*. at 757, and we discern no application of Rule 702 or *Motorola* in the trial court's ruling.

A *Motorola* analysis would have allowed for an opportunity to assess the fact that Mr. Miller's reconstruction of the crash took place four years later, as well as Mr. Chase's misunderstanding that Mr. Miller's report was conducted "immediately following the crash . . . [with] critical scene physical evidence which dissipates over

time . . . forensically mapped and documented." Here, there was no analysis of Mr. Faltz's request to exclude the government's accident-reconstruction experts, and we conclude that a remand for further analysis as required under *Motorola* is necessary.

Admitting the government's accident-reconstruction experts without conducting a *Motorola* analysis is not, as the government contends, a harmless error. An error is harmless if "we can say, 'with fair assurance . . . that the judgment was not substantially swayed by the error.'" *Gardner v. United States*, 140 A.3d 1172, 1183 (D.C. 2016) (quoting *Clayborne v. United States*, 751 A.2d 956, 968 n.12 (D.C. 2000)). On the accident-reconstruction issue, the accounts of both parties appear rooted in data and calculations with divergent conclusions: the government experts assert that the Crown Victoria's driver would have hit the airbag head-on, while Mr. Faltz's expert concludes that the driver would have hit the airbag at an angle. The accident-reconstruction evidence is significant because it frames how the DNA evidence itself should be viewed, which, in turn, forms the foundation of the government's case against Mr. Faltz. Thus, we cannot say "with fair assurance" that the trial court's admission of the government's experts without a *Motorola* analysis did not substantially sway its ruling on Mr. Faltz's IPA claim.

Interwoven with the expert issue is Mr. Faltz's claim that the trial court failed to grapple with the full set of evidence presented at the November 2022 hearings to demonstrate his innocence.[5]  We review the trial court's IPA ruling for abuse of discretion.  *Richardson v. United States*, 8 A.3d 1245, 1248-49 (D.C. 2010).  As the IPA sets out:

> In determining whether to grant relief the court may consider any relevant evidence, but shall consider the following:
>
> (A) The new evidence;
>
> (B) How the new evidence demonstrates actual innocence;
>
> (C) Why the new evidence is or is not cumulative or impeaching;
>
> (D) If the conviction resulted from a trial, and if the movant asserted a theory of defense inconsistent with the current claim of innocence, the specific reason the movant asserted an inconsistent theory at trial; and

---

[5] During oral argument, the government asserted that Mr. Faltz did not present an IPA claim in his briefing—instead arguing only that the trial court violated his due-process rights by finding that his guilty plea evinced his guilt—and that, as a result, a "freestanding" IPA claim is not before us.  Mr. Faltz's IPA briefing did indeed focus on his due-process claim, but we find that the interconnected nature of the expert testimony and guilty-plea issues, undisputedly briefed by both parties, fairly encompasses review of the trial court's analysis as to whether or not Mr. Faltz demonstrated his innocence by a preponderance of the evidence as required under the IPA.  D.C. Code § 22-4135(g)(2).

(E) If the conviction resulted from a guilty plea, the specific reason the movant pleaded guilty despite being actually innocent of the crime.

D.C. Code § 22-4135(g)(1). A court must grant a new trial if it "concludes that it is more likely than not that the movant is actually innocent of the crime." D.C. Code § 22-4135(g)(2).

Citing Mr. Faltz's "repeated[]" statements that he was "responsible for the murder in this case" and the accident-reconstruction conclusions of Mr. Chase, the trial court determined Mr. Faltz and his accident-reconstruction witness to be non-credible and found that the evidence of his innocence fell short of a preponderance. We discern no clear error in the trial court's determination of Mr. Faltz's credibility. *See Stringer v. United States*, 301 A.3d 1218, 1228 (D.C. 2023) (noting that we review the trial court's credibility determinations in the IPA context for clear error).[6]

However, Mr. Faltz presented other evidence of his innocence beyond his own testimony. He put forward evidence of new DNA findings using probabilistic genotyping and an accident-reconstruction expert in addition to his own prior

---

[6] We decline to hold as a matter of first impression, as Mr. Faltz advocates, that the trial court violated his due process rights in making various comments asking why an innocent person would plead guilty. We are not persuaded that the court's ruling was driven by a belief that guilty pleas categorically preclude innocence—rather, the order appears driven by an interpretation of Mr. Faltz's 2006 statements as admissions of guilt.

repeated statements of his innocence. The trial court's order does not fully grapple with this evidence. Nor did the trial court's order contend with the fact that all of the eyewitness MPD officers identified Dorrell Ingram, and not Mr. Faltz, as the driver of the Crown Victoria at the time of the collision. The trial court interpreted some of Mr. Faltz's statements of guilt without discussing the context in which the statements were made. In its order, the trial court stated and reiterated that Mr. Faltz had admitted to Mr. Bond that he was the driver of the car at the time of the collision. When asked whether Mr. Faltz had at any time "acknowledged that he was driving at the time of the collision," Mr. Bond answered affirmatively, but his subsequent testimony is somewhat unclear. Mr. Bond described Mr. Faltz indicating to him that he was the driver after just being presented with the government's DNA evidence and told by Mr. Bond that "if you did this, this is about as good as it's going to get." He also states that Mr. Faltz "had indicated to me that he had been driving. And then he would indicate that he hadn't been driving. So when the trial was called, he had told me both things." The trial court's order emphasizes Mr. Faltz's letter to the court at sentencing stating that he had "been the cause of someone losing their life" as evidence of his guilt. But the trial court's order does not mention Mr. Faltz's statement to the PSR writer that he was not driving the car when it crashed. The PSR reads, "Mr. Faltz reported that his codefendants reported that he was driving,

but he was not. This writer asked if he was not driving why did he plead guilty and he responded, 'I didn't think it was a winnable case.'"

The government acknowledges that the trial court's IPA analysis was done "in a fairly cursory fashion," but argues that the court "was not obligated to do it in a more fulsome way." Further, the government argues that the trial court's credibility determination of Mr. Faltz "goes a long way to making it very tough" to establish an IPA claim. However, the IPA requires that courts "shall" consider various factors, including "the specific reason the movant pleaded guilty despite being actually innocent of the crime." D.C. Code § 22-4135(g)(1)(E). While we defer to the court's credibility determinations themselves, *Richardson*, 8 A.3d at 1249, the trial court is obligated to consider all of the factors outlined in the IPA. *Bouknight v. United States*, 867 A.2d 245, 258 (D.C. 2005) (concluding that review of an IPA claim requires consideration of all statutory factors and that it is "unnecessary and inappropriate" to "recogniz[e] credibility as a separate basis for a ruling independent of the considerations set forth by the statute"). Therefore, we remand to the trial court for further analysis of the totality of the evidence Mr. Faltz presented in his IPA claim.

### III.    Conclusion

For the foregoing reasons, we affirm the trial court's denial of Mr. Faltz's IAC claims but remand his IPA claim to the trial court for further analysis of the experts' admissibility and evidence of Mr. Faltz's innocence consistent with this opinion.

*So ordered.*